J-A04013-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | No. 838 MDA 2025 |

Appeal from the Decree Entered May 26, 2025
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  62 OC 2024

| | | |
|---|---|---|
| IN THE INTEREST OF S.D.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | No. 839 MDA 2025 |

Appeal from the Decree Entered May 26, 2025
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  63 O.C. 2024

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | No. 840 MDA 2025 |

Appeal from the Decree Entered May 26, 2025
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  64 O.C. 2024

BEFORE: PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED: MAY 12, 2026**

D.W. ("Father") appeals from the decrees in the Tioga County Court of Common Pleas that involuntarily terminated his parental rights to his sons, A.M.J., born in March 2013; S.D.J., born in July 2014; and D.L.J., born in October 2018 (collectively, "the Children").[1] Upon review, we affirm.

We gather the following factual and procedural history of this case from the certified record. Parents never married but resided together with the Children in the state of Kansas until March 2020. *See* N.T., 1/15/25, at 10-12. At that time, Father learned that Mother had initiated a relationship with a new paramour. *See* N.T., 1/17/25, at 60-63. Father became distraught and allegedly began to threaten Mother and another adult present. *See id.* The police were summoned to the home and arrested Father. *See id.* Father was charged with two counts of "endangerment" in Kansas.[2] *Id.*; *see also* DHS Exhibit 2. Thereafter, Mother and the Children moved to Tioga County,

---

[1] By separate decrees entered on May 27, 2025, the orphans' court also terminated the parental rights of the Children's biological mother, E.S. ("Mother") (collectively with Father, "Parents"). Mother filed notices of appeal which we dispose of by separate memorandum at Superior Court Docket Nos. 803-805 MDA 2025.

[2] "Endangerment is recklessly exposing another person to a danger of great bodily harm or death." K.S.A. 21-5429(a); *see also* K.S.A. 21-6602.

Pennsylvania, to reside with her paramour and his teenage daughter from a previous relationship, A.W. *See* N.T.,1/15/25, at 10-12.

On May 28, 2021, Father pled guilty to both counts of endangerment. *See* DHS Exhibit 3. The Kansas court sentenced Father to one year of probation and ordered him to (1) complete a domestic violence assessment and comply with any recommendations and (2) obtain a mental health evaluation and comply with any recommendations. *See id.*

Between March 2020, and February 2023, prior to the Children's dependencies, Father visited with the Children in approximately August or September 2021, when Mother was in Kansas for approximately one month. *See* N.T., 1/17/25, at 39-40. Contemporaneously, Father also had contact with the Children via phone and video calls every couple of weeks. *See id.* at 38-39.

On February 10, 2023, Tioga County Department of Human Services ("DHS") obtained emergency protective custody of the Children, then nine, eight, and four years old, respectively. *See* N.T., 1/15/25, at 38. DHS removed the Children from Mother's care following receipt of two audio recordings that contained purported abuse perpetrated by Mother's paramour against the Children.[3] *See id.*; *see also* DHS Exhibit 17. A.W. had recorded

_____

[3] Following an investigation, DHS deemed a Child Protective Services ("CPS") report indicated as to A.M.J. and S.D.J. *See* N.T., 1/15/25, at 38-39; *see also* DHS Exhibit 17. Throughout the instant case, Mother repeatedly denied
*(Footnote Continued Next Page)*

the incidents of abuse due to her concern that the Children would "end up in the hospital or in an early grave." N.T., 1/15/25, at 119.

The Children have been in numerous, separate foster placements since their removal. *See* N.T., 1/17/25, at 112-117. A.M.J., the oldest child, is diagnosed with autism. *See* N.T., 1/31/25, at 111. S.D.J., the middle child, is diagnosed with oppositional defiant disorder ("ODD") and attention deficit hyperactivity disorder ("ADHD"). *See* N.T., 1/31/25, at 112. D.L.J., the youngest child, is diagnosed with ODD. *See* N.T., 1/30/25, at 34. The Children frequently displayed aggressive behaviors in their various foster placements. *See* N.T., 1/17/25, at 112-115; *see also* N.T., 1/29/25, at 198-199.

The juvenile court adjudicated the Children dependent on April 11, 2023, and established their permanency goals as reunification. In furtherance thereof, the court ordered Father to, *inter alia*, submit to a psychological evaluation and follow all resulting recommendations, attend supervised visits with the Children, and complete an application for the Interstate Compact on the Placement of Children ("ICPC"). *See* N.T., 1/31/25, at 24-25.

Despite participation in the Children's dependency proceedings, Father repeatedly told DHS that he was not a reunification resource for the Children. *See* N.T., 1/29/25, at 9-10; *see also* N.T., 1/31/25, at 24, 76; *see also* N.T.,

that the Children were abused by her and her paramour. *See* N.T., 1/31/25, at 26.

3/27/25, at 105. Moreover, Father did not take any action to become a viable resource for them. Specifically, after DHS filed an ICPC on his behalf, Father informed the agency that he was not a resource for the Children and requested to discontinue the process. **See** N.T., 1/31/25, at 24; **see also** DHS Exhibit 18; **see also** N.T., 1/1725, at 41-42. While Father did ultimately participate in a psychological evaluation in July 2023, he refused to follow the recommendations, discussed *infra*. **See** N.T., 1/29/25, at 8-9; **see also** N.T., 1/31/25, at 9-11 , 76; **see also** N.T., 3/27/25, at 112-113. Finally, while Father attended the majority of the weekly supervised visitations with the Children via Zoom, he only visited the Children in person on two occasions during their dependencies, in July 2023, and May 2024. **See** N.T., 1/30/25, at 148; **see also** N.T., 1/31/25, at 49; **see also** N.T., 3/27/25, at 87.

On July 30, 2024, DHS filed petitions seeking the involuntary termination of Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In compliance with Section 2313(a) of the Adoption Act, the court appointed Jamie L. Cook, Esquire, as legal interest counsel ("LIC") for the Children. **See** Order, 7/31/24. Further, the court appointed Timothy A.B. Reitz, Esquire, as the Children's guardian *ad litem* ("GAL"). **See id.**

The orphans' court conducted an evidentiary hearing over the course of seven days: January 15, 2025, January 17, 2025, January 29-31, 2025, and March 27-28, 2025. At this time, the Children were approximately eleven,

ten, and six years old, respectively. DHS, Mother, and the GAL offered the testimony of numerous witnesses. Pertinently, DHS presented the testimony of Clara Holley, the family's former reunification service provider who attempted to assist Father with his court-ordered goals; Caroline Phillips, supervisor of the Children's treatment and therapist of D.L.J. at Crossroads Counseling,[4] and Carrie Milkie, Kaitlyn Wetzel, and Jeanete Seleski, DHS employees. DHS also introduced, and the court admitted, a myriad of exhibits. Father appeared virtually and testified on his own behalf.

The orphans' court issued decrees on May 26, 2025, involuntarily terminating Father's parental rights to the Children. In its opinion accompanying the decrees, the orphans' court provided its rationale pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

On June 25, 2025, Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. On July 31, 2025, the orphans' court filed its Rule 1925(a) opinion.

On appeal, Father presents the following issues for our review:

1. Whether the [orphans'] court erred and/or abused its discretion in finding that the Agency established clear and convincing evidence that [Father's] parental rights to [the Children] should be involuntarily terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1)[?]

_____

[4] The court accepted Ms. Phillips as an expert in trauma and attachment therapy. *See* N.T., 1/30/25, at 11-13.

- 6 -

2. Whether the [orphans'] court erred and/or abused its discretion in finding that the Agency established clear and convincing evidence that the involuntary termination of [Father's] parental rights to [the Children] promoted the developmental, physical and emotional needs and welfare of the [C]hildren pursuant to 23 Pa. C.S.A. § 2511(b)[?]

Father's Brief at 4.[5]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions

_____

[5] We note with displeasure that the GAL and the LIC failed to file briefs in the instant appeal. However, at the conclusion of the termination hearing, the LIC reported she individually asked the Children about their preferred outcome. *See* N.T., 3/28/25, at 56-59. The LIC informed the orphans' court that only S.D.J. even mentioned Father, but his preference was to reunify with Mother. *See id.* Further, in compliance with the orphans' court's directive at the conclusion of the termination hearing, the LIC filed proposed findings of fact and conclusions of law. Therein, she requested that the orphans' court deny DHS's petitions. *See* LIC Proposed Findings of Fact and Conclusions of Law, 4/25/25.

concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

Our analysis in this case will focus upon 23 Pa.C.S.A. § 2511(a)(1) and (b), which provide, as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the

- 8 -

> petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to Section 2511(a)(1), "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" *In re Adoption of C.M.*, 255 A.3d 343, 363-64 (Pa. 2021) (citation and footnote omitted).

Our Supreme Court has explained:

> "Parental duties" are not defined in the Adoption Act, but our courts long have interpreted parental duties "in relation to the needs of a child[,]" such as "love, protection, guidance and support." *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977). Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. *C.M.*, 255 A.3d at 364.  The roster of such positive actions undoubtedly includes communication and association.  *Id.* (citing *In re*

- 9 -

> **Adoption of Smith**, 412 Pa. 501, 194 A.2d 919, 920 (1963)).
> **The performance of parental duties "requires that a parent**
> **exert himself to take and maintain a place of importance in**
> **the child's life."** *Id.* **(internal citations omitted). Fortitude**
> **is required, as a parent must act with "reasonable**
> **firmness" to overcome obstacles that stand in the way of**
> **preserving a parent-child relationship and may not wait for**
> **a more suitable time to perform parental**
> **responsibilities.** *Id.*

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (emphasis added).

However, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" *Id.* at 593. The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.*

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has directed

- 10 -

that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child. ***In re E.M.***, 620 A.2d 481, 485 (Pa. 1993); ***see also Interest of K.T.***, 296 A.3d 1085, 1109-10 (Pa. 2023).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. Indeed, the High Court stated:

> Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

***Id.*** "The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. ***K.T.***, 296 A.3d at 1109. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm. ***Id.*** at 1109-10.

This Court has recognized that,

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological

- 11 -

aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Our Supreme Court has recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109.

In his first issue, Father argues that the evidence was insufficient to terminate his parental rights pursuant to Section 2511(a)(1). *See* Father's Brief at 8-11. Specifically, Father argues that he maintained his parental claim to the Children by attending the dependency hearings virtually, visiting with the Children via Zoom, and staying in contact with DHS. *See id.* at 9. He baldly claims that he performed parental duties, albeit from a distance. *See id.*

Father also contends that the court failed to consider the geographic and financial obstacles that prevented him from visiting the Children in-person and completing his required services. *See id.* at 9-11. Specifically, he argues that his employment involves long hours and that he is not afforded paid vacation or health insurance. *Id.* He asserts that visits to Tioga County, which required at least two days of travel, were not feasible due to the time as well as financial cost. *See id.* Similarly, Father asserts that mental health

counseling would result in out-of-pocket expenses he could not afford. **See**

**id.** at 10-11. Finally, Father argues that he already completed mental health

counseling as a result of his criminal sentence.

The orphans' court set forth the following factual findings, which the

testimonial evidence supports:

> The court acknowledges the financial burdens inhibiting Father's immediate acceptance of the custody of the Children upon their removal. However, even accounting for those issues, there is clear and convincing evidence to establish that Father has for a period well exceeding six months prior to the filing of the termination petition, and continuing to the date of termination, failed or refused to perform parental duties. Father became aware of the removal of the Children from Mother's home after their removal on February 10, 2023. N.T., 1/17/25, at 41-42. However, he made no sustained, consistent effort to become an available resource for the Children. While he attempted to institute the ICPC process twice, the initial attempt was discontinued in June 2024, at his request. DHS Exhibit 18; N.T., 1/17/25, at 41. He attempted to complete the ICPC process again in August to September 2024, which was eventually closed due to Father's failure to follow through with requirements, although Father disputed this. DHS Exhibit 18; N.T., 1/17/25, at 44-45. Instead, he took the position that the Children should be returned to Mother and her paramour. N.T., 3/27/25, at 101-103. . . .
>
> Father visited the Children in Pennsylvania in July 2023 and May 2024. Both of those trips included travel and hotel costs paid by DHS. N.T., 1/31/25, at 49. Beyond those two trips, Father additionally asked for transportation to be arranged for the originally scheduled date for the termination hearing in October 2024. N.T., 1/31/25, at 49. However, aside from those three times, [Father] did not request further trips. N.T., 1/31/25, at 50.
>
> . . .
>
> Father testified multiple times that[,] despite having multiple convictions for domestic violence charges in Kansas and having followed through with mental health services and counseling as a condition of his criminal sentence, he would not obtain any further

- 13 -

counseling or mental health services as he "didn't see the point in doing it again, spending the money, just to do the same thing." N.T., 1/17/25, at 48-49. Father eventually completed a psychological evaluation on July 18, 2023, which resulted in specific recommendations, but Father did not follow through with the same. N.T., 1/17/25, at 49-50. Notably, it required a trip to Tioga County before Father was willing to obtain the required psychological evaluation.

Father also consistently stated the position to DHS and support staff that he was not a placement option for the Children. N.T., 1/29/25, at 9-10, 37.

. . .

In sum, for six months prior to July 30, 2024, when the petitions in this matter were filed, Father had consistently refused or failed to perform the important parental duties for the Children. After initially identifying himself as "not a placement option," he then failed to complete counseling requirements, initiated but did not follow through with the ICPC process twice, and visited the Children in Pennsylvania only once during [the six months prior to the filing of DHS's petitions].

Orphans' Court Opinion, 7/31/25, at 7-9 (cleaned up). The orphans' court's findings are supported by the certified record.

Primarily, Father consistently stated that he was not a resource option for the Children. *See* N.T., 1/17/25, at 42-44; *see also* N.T., 1/29/25, at 9-10, 37; *see also* N.T., 1/31/25, at 24. DHS first initiated an ICPC application on Father's behalf in February 2024. *See* N.T., 1/31/25, at 24; *see also* DHS Exhibit 18. However, Father withdrew the application in June 2024, stating that he was not a viable resource for the Children. *See id.* Indeed, Father testified that, in June 2024, he could not alter his work schedule wherein he worked the "night shift," and, therefore, he would not be able to care for the

Children.[6]  **See** N.T., 1/17/25, at 42-44.  Ms. Holley, a reunification service provider who worked with Father from approximately June 2023, to March 2024, testified that Father maintained minimal contact with her because he was not a placement option for the Children.  **See** N.T., 1/29/25, at 9-10, 37.

Furthermore, Father only physically visited the Children in Pennsylvania twice during the two years since the court adjudicated them dependent, once in July 2023, and again in May 2024.  **See** N.T., 1/31/25, at 49.  Notably, Ms. Milkie, DHS caseworker, testified that his July 2023 visit only occurred because Father was in Pennsylvania for his psychological evaluation.  **See id.**  Further, she testified these were the only instances that Father even requested physical visits with the Children.  **See id.**  Accordingly, the vast majority of his supervised visits, which as best we can discern Father attended, occurred via Zoom once a week for an hour.  **See** N.T., 3/27/25, at 83, 87.

Significantly, Ms. Phillips, clinical supervisor and therapist for D.L.J., testified that the Children, because of their above-referenced diagnoses,

---

[6] We note that DHS commenced a second ICPC application at the behest of Father in September 2024.  **See** N.T., 1/31/25, at 24; **see also** DHS Exhibit 18.  The initiation of this application occurred after Father received notice of DHS's petitions seeking the involuntary termination of Father's parental rights. Accordingly, the orphans' court was prohibited from considering Father's conduct in this regard.  **See** 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

require stability, predictability, and safety from their caregivers. *See* N.T., 1/30/25, at 25-28. She further opined that relying on video calls is insufficient to repair or rebuild a relationship because "children need to feel affection. They need to feel hugs; they need to be able to physically . . . see that person[.]" *Id.* at 29. Father has not demonstrated stability or predictability. Indeed, as related *supra*, he has consistently indicated he is not a resource for the Children.

Finally, although Father eventually completed a psychological evaluation in July 2023, Ms. Holley testified that he refused to follow the recommendations, namely an anger management course focused on assertiveness training and individual therapy. *See* N.T., 1/29/25, at 8-9; *see also* N.T., 1/31/25, at 9-11 , 76; *see also* N.T., 3/27/25, at 112-113. Importantly, Ms. Holley also stated that Father could have received financial assistance from DHS to cover the services he was ordered to complete. *See* N.T., 1/29/25, at 42. However, Father, who had been ordered to engage similar services after pleading guilty to the criminal charges as discussed *supra*, confirmed during his testimony that he "didn't see the point in doing" these services again. N.T., 1/17/25, at 48-49.

Based upon the foregoing, the certified record evinces that Father failed to perform parental duties for the Children far in excess of the statutory six-month period. While the orphans' court acknowledged the geographic and financial obstacles that Father encountered, it found dispositive Father's lack

of fortitude in overcoming these obstacles given his consistent statements that he was not a placement option for the Children, failure to request additional physical visitations, unwillingness to participate in the recommended services despite financial assistance being available, and his withdrawal of the initial ICPC application. Therefore, we discern no abuse of discretion by the orphans' court pursuant to Section 2511(a)(1).

Next, we turn to Section 2511(b). Father contends that the court abused its discretion because involuntarily terminating his parental rights did not serve the developmental, physical, and emotional needs and welfare of the Children. *See* Father's Brief at 14. Father baldly asserts that he shared a necessary and beneficial parental bond with the Children. *See id.* at 13-14. He argues that he has provided the Children "with much-needed love and nurturing." *Id.* at 14.

Father also argues that the Children's lack of stability in their foster placements is the genesis for their behavioral and mental health challenges. *See id.* at 13-14. Father challenges the court's reliance on Ms. Phillips' "suggestion" that the Children cannot properly bond with foster families due to the trauma they suffered at the hands of Mother and her paramour. *See id.* at 14.

In its Rule 1925(a) opinion, the orphans' court acknowledged that terminating the "paternal bond" between Father and the Children "will likely have some adverse effect on the [C]hildren." Orphans' Court Opinion,

- 17 -

7/31/25, at 12. Nonetheless, the orphans' court found that the Children recognize Mother's paramour as their "dad." *Id.* at 11. The court also stressed that Father had limited physical contact with the Children starting in March 2020, and "has no[] intention of accepting placement of the [C]hildren" with him. *Id.* at 11-13. Finally, relying on Ms. Phillips' testimony, the court emphasized the Children's need for stability in order to "process the trauma" they experienced, while in Mother's custody in Pennsylvania. *Id.* at 13. Thus, the orphans' court found that involuntarily terminating the parental rights of Father best served the Children's developmental, physical, and emotional needs and welfare. *See id.* at 13. The record supports the court's findings.

There is no indication in the certified record that termination of Father's parental rights would cause the Children "extreme emotional consequences" or significant, irreparable harm. *K.T.*, 296 A.3d at 1109. After Mother moved to Pennsylvania with the Children in March 2020, Father, who remained in Kansas, rarely had physical contact with the Children. *See* N.T., 1/31/25, at 49. Ms. Milkie, DHS caseworker, testified that Father traveled to visit the Children on just two occasions. *See* N.T., 1/31/25, at 49. Further, Mother and Ms. Seleski, DHS foster care supervisor, testified that the Children refer to Mother's paramour as "dad." N.T., 1/15/25, at 76; *see also* N.T., 1/17/25, at 87-88. While Father criticizes the Children's lack of stability in their foster placements, he has repeatedly stated that he is not a placement option for the Children.

Further, the court was well within its discretion to rely on the testimony of Ms. Phillips, an expert in trauma and attachment therapy. **See** N.T., 1/30/25, at 11-13. Ms. Phillips opined that the Children require "consistency and structure . . . predictability and safety." **Id.** at 27. She further posited that it is imperative for "[t]he offender take responsibility for what [they have] done . . . . [I]f someone is denying that something happened and not taking responsibility for it, it's hard to move forward in that process[.]" **Id.** at 24. As the court's references to Ms. Phillips' testimony are supported in the record, Father's contention does not warrant relief.

We note that the Children have struggled in their numerous placements since being removed from Mother and her paramour. Initially, A.M.J., the oldest child, was defiant and argumentative with his foster placements. **See** N.T., 1/17/25, at 112-113. However, at the time of the termination hearing, Ms. Seleski testified that he was "doing really well" with his foster mother, L.K., while receiving mental health counseling at Crossroads Counseling. **Id.**; **see also** N.T., 1/30/25, at 2-4, 97. S.D.J., the middle child, also displayed behavioral issues, including aggression and instigating altercations with the other children in his foster placements. **See** N.T., 1/17/25, at 114-115. At the time of the termination proceedings, he had been placed at KidsPeace for approximately one year where he was receiving inpatient behavioral and mental health treatment. **See id.** at 114. Similar to his older brothers, D.L.J., the youngest child, exhibited problematic, aggressive behaviors in his foster

placements. *See* N.T., 1/29/25, at 198-199. D.L.J. has received a myriad of therapeutic treatments and was admitted to Belmont Hospital in December 2024. *See* N.T., 1/15/25, at 52; *see also* N.T., 1/29/25, at 122-123, 195. As best we can discern, he has been released from the hospital but is not currently in a pre-adoptive foster home.

Relying on Ms. Phillips testimony, the court aptly determined that, despite the aforementioned struggles, involuntarily terminating Father's parental rights was in the Children's best interests. *See* Orphans' Court Opinion, 7/31/25, at 13. As discussed *supra*, the Children require stability and consistency in order to resolve their significant issues, which they have not received due, in part, to Father's unavailability. Accordingly, the court was well within its discretion to determine that the Children's emotional needs and welfare were best served by involuntarily terminating Father's parental rights.

Based upon our review of the record, we discern no abuse of discretion in the court's conclusion that the Children's developmental, physical, and emotional needs and welfare will be served by the termination of Father's parental rights pursuant to Section 2511(b). Accordingly, we affirm the decrees.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/12/2026